LAW OFFICES
OF
# JEFFREY B. GRIMM, P.C.

TELEPHONE
(404) 842-2610

FACSIMILE
(404) 266-7459

RESURGENS PLAZA, SUITE 2750
945 EAST PACES FERRY ROAD
ATLANTA, GA 30326

WEBSITE
WWW.JEFFGRIMMLAW.COM

EMAIL
JEFF@JEFFGRIMMLAW.COM

March 9, 2021

**VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED AND VIA E-MAIL (pburdette@custard.com)**

Pamela Burdette, Senior Claims Adjuster
Custard Insurance Adjusters, Inc.
3135 Avalon Ridge Place, Suite 200
Norcross, Georgia 30071

> Re:  My Client:           Dondrea Clay
>      Date of Incident:    August 13, 2019
>      Location of Incident: Store 1057, Ellijay, Georgia
>      Your File No.:       025-041451

Dear Ms. Burdette:

As you know, I represent Dondrea Clay in the above-referenced matter. This will be the demand of my client for compromise and settlement of the above-referenced claim, and is being made pursuant to O.C.G.A. § 24-4-408 as an offer of compromise and settlement, and therefore, no part of this demand will be admissible in any court proceeding or civil action arising out of this matter. For the sake of brevity, the following is a concise summary of the relevant issues.

## Statement of Facts and Liability

As you know, as of the date of the incident, Ms. Clay was employed with O'Reilly Auto Parts and was responsible for delivering items to different locations. Late in the evening of August 13, 2019, Ms. Clay parked her truck (trailer 554251) at Store 1057 in Ellijay, Georgia to make a delivery. After arriving, Ms. Clay extended the lift gate from the truck, which is attached to the truck by two chains on each side. As Ms. Clay started to remove a pallet of goods from the truck onto the lift gate for delivery, the chain on the right side of the truck gave way, causing the pallet jack to slide to the right. Ms. Clay's right hand fingers were caught between the liftgate chain and the pallet jack, causing serious injuries to her right hand, including the severing of her right index finger (see pictures attached). After screaming for help for over an hour, Ms. Clay was able to remove the chains with a wrench she found, call the police and was transported to the hospital. She has been treating for her injuries since, which has included one surgery and possibly additional surgeries. Ms. Clay has also been unable to work as a result of her

EXHIBIT B

Ms. Pamela Burdette, Sr. Claims Adjuster
March 9, 2021
Page 2

---

injuries and treatment.

This incident was clearly caused by your insured's negligence. Prior to the subject incident, on August 10, 2019, Ms. Clay requested repairs to the lift gate chain. The mechanic for Idealease received the repair request on August 12th, and "fixed" the liftgate on August 13th prior to the incident. Unfortunately, instead of properly repairing or replacing the liftgate chain, your mechanic improperly repaired the liftgate chain, and inexplicably spray painted the arm that holds the chain.

Since liability is strong in this claim, the remainder of this demand will focus on the damages my client suffered, including medical expenses, lost income, and pain and suffering.

## Medical Treatment and Damages

### Gilmer County EMS

Dondrea Clay called **Gilmer County EMS** for emergency medical aid in the early morning hours of 8/14/2019. Alone at the scene, her right hand was entrapped in work equipment. Audibly crying, Ms. Clay told the dispatcher her fingers were bleeding with bones showing. Minutes into the call, she extricated her hand and said fingers on her right hand were broken but still attached. Subsequently, she began feeling numb and could no longer feel her hand. When the EMS unit arrived on the scene, Ms. Clay was crying and grimacing in pain. Emergency care was provided and hand/fingers were splinted. IV Fentanyl x 1 and IV Ketamine x 3 were given for pain during Ms. Clay's treatment and transport to Wellstar Kennestone Hospital. The 911 call from Ms. Clay is devastating and compelling.

### Wellstar Kennestone Hospital

Ms. Clay was admitted to the Emergency Department of **Wellstar Kennestone Hospital** at 02:56 AM. The mechanism of injury recorded was an amputation and crush injury of the right hand and fingers. Her right index finger was partially amputated at the middle phalanx with an open fracture. The right third digit had a crush deformity at the middle phalanx. Right hand tenderness, deformity, swelling, and decreased sensation were noted. X-rays confirmed a fracture through the distal third of the middle phalanx of the right second finger and severe laceration on the palmar aspect of the middle phalanx of both her right third and second fingers. Anemia with a hemoglobin of 10.5 g/dL (Low) was detected after the traumatic injury with blood loss. IV Morphine for pain was followed by a digital nerve block to the right index and middle fingers. An IV antibiotic and Tetanus booster were administered prophylactically. Extensive wound irrigation with

Ms. Pamela Burdette, Sr. Claims Adjuster
March 9, 2021
Page 3

---

betadine/saline jet lavage was done and a dressing was applied. Transfer to Grady Hospital was arranged because of the possibility that revascularization surgery might be necessary. A second digital block was performed for Ms. Clay's exacerbating pain and then an uneventful transport to Grady by MetroAtlanta Ambulance Service occurred.

### *Grady Hospital*

At **Grady Hospital Emergency Department,** Dr. Eric Beyer documented obvious deformities to the second and third phalanges of the right hand with exposed bone on the second mid phalanx. A plastic surgery/hand consult was made by Dr. Carolyn Tailion. She reported a near circumferential laceration over phalanx 2 of the right index finger with decreased flexion and tenodesis. Displacement in the P2 fracture of the right index finger was apparent. The right middle finger showed a compression injury over phalanx 2 with a laceration over the volar aspect of the DIP (distal interphalangeal) joint. Limited flexion and extension of the ring and small fingers was also noted. The wounds were extensively irrigated and lacerations were sutured. A dressing of Xeroform and Kerlex was applied and the fingers splinted. A follow-up appointment was scheduled with Grady Hand Surgery/Orthopedics Clinic on 08/16/2019 and Ms. Clay was discharged home with two prescriptions for pain management: Gabapentin 300 mg three times daily and Percocet 5-325 mg every six hours as needed for pain.

### *Dr. Clifton Meals of Grady Hospital Hand Surgery/Orthopedic Clinic*

Dr. Clifton Meals of **Grady's Hand Surgery/Orthopedic Clinic** saw Ms. Clay on 08/16/2019. He noted Ms. Clay was experiencing pain of the right index and long fingers with numbness throughout her whole hand. His exam confirmed diminished sensation throughout. Pain control and antibiotic medications were continued and surgery scheduled on 08/20/2019 for a closed reduction and percutaneous pinning with possible tendon, vessel, and nerve repair. Dr. Meals ultimately performed an I & D (Incision and Drainage) and ORIF, (Open Reduction Internal Fixation). During the open treatment of the phalangeal shaft fracture, K-wires were passed through the distal phalanx, across the DIP, across the fracture site and into the base of the middle phalanx. Foreign material was debrided and nonviable tissue at the fracture site including tendon, fascia and skin was sharply excised. He found that the radial digital nerve had been cut during the accident so viable nerve ends were not identifiable. The FDP tendon was also lacerated over ½ its width. Postoperatively, pain control, limb elevation, immobilization of the limb, and DVT prophylaxis were ordered.

Ms. Pamela Burdette, Sr. Claims Adjuster
March 9, 2021
Page 4

---

On 08/21/2019 and 08/26/2019, Ms. Clay sought treatment at the **Emergency Department of Grady Hospital** for uncontrolled post-operative pain which was treated with narcotic analgesics.

Four post-surgical follow up visits were made with Dr. Clifton Meals. On 8/28/19, Ms. Clay reported burning pain in her index and middle fingers. Gabapentin was increased to 600 mg TID. A modified dorsal blocking shield splint was applied to her right upper extremity. On 9/20/19, pins were removed. Her incisions were healed or healing without evidence of infection. Ms. Clay described persistent decreased or absent sensation in her index, middle, ring and small fingers as well as burning pain in the index and middle fingers. Gabapentin was continued at 600mg TID. Plans were initiated for PT/OT at **the Outpatient Hand Clinic of Grady Hospital** and 12 visits were approved by insurance. By 10/25/19, Ms. Clay was able to make half a fist. Sensation was still diminished in her right upper index finger and tip of the middle finger. Ibuprofen was ordered. At the 12/20/19 visit, Doctor Meals noted Ms. Clay was "more down today." She had been reliving the accident and the episodes were accompanied by tachycardia. She reported "I just don't feel like me." She asked him many questions about time and outcome and was distressed by her inability to make a fist at this juncture. Dr. Meals referred Ms. Clay for a psychological assessment in response. Pain was affecting her home exercise capabilities. The doctor noted her phalanges moved as a unit rather than independent of each other. Diminished sensation in the index and middle finger persisted. He expected more ROM at this point and felt fibrous union of the index phalange 2 was responsible. The splint was to be worn as needed. PT/OT continued with insurance authorization for an additional ten visits. Therapy notes provide specific numerical ROM and strength measurements. Ms. Clay was noted to be cooperative, motivated, and compliant during her therapy and compliant with the home exercise program. As healing of the wounds occurred and therapeutic exercises and treatments were provided, improvement in functional limitations was noted, however, deficits in self-performance of particular activities of daily living persist due to injury of her dominant hand.

### *Dr. David Rush, Ph.D., Licensed Clinical Psychologist*

**David B. Rush Ph.D., Licensed Clinical Psychologist** was consulted on January 23, 2020 upon referral from Dr. Clifton Meals. A psychological evaluation was performed on January 24, 2020. This included a Clinical Interview, Mental Status Exam, and Minnesota Mulitiphasic Personality Inventory-2-Restructured Form. His diagnostic impression was that Ms. Clay suffered from an Adjustment Disorder with Mixed Anxiety and Depressed Mood and opined that Ms. Clay appeared to be experiencing valid adjustment issues with symptoms of depression and anxiety secondary to her injury and her resultant lifestyle limitations. He recommended individual psychotherapy to strengthen her coping abilities and a psychiatric evaluation to determine the

Ms. Pamela Burdette, Sr. Claims Adjuster
March 9, 2021
Page 5

---

appropriateness of medication. Psychotherapy visits were provided weekly from February 2020 through August 2020 and continued twice a month thereafter.

### *Summit Spine and Joint Center*

Ms. Clay was seen at **Summit Spine and Joint Center** (Summit) by multiple providers between 12/09/2019 and 08/12/20 for right hand and arm pain. The facility used a numerical scale to evaluate pain severity. On 12/09/2019, pain rating average was 7/10, described as constant and radiated from her right arm to the right hand. Painful sensations of numbness, burning, aching, stabbing, and shooting are noted. A diagnosis of Complex Regional Pain Syndrome I (CRPS) of the right upper limb was confirmed. Tramadol HCl 50 mg was ordered every 12 hours as needed for pain. Topical Lidocaine was also initiated and Gabapentin 600 mg continued. A Right C6 Stellate Ganglion Block to treat CRPS of the right upper extremity was planned pending authorization. The doctor recommended she remain out of work.

A Right C6 Stellate Ganglion Block was done without complication on 01/07/20. Pain severity average was 7/10 on 01/20/20. Without pain medication, pain was 10/10. With pain medication it was 3/10. Pain radiated from the tip of her right fingers and knuckles into Ms. Clay's forearm, shoulder, and neck. Painful sensations were described as numbness, burning, aching, stabbing, and shooting. Following the ganglion block, an improvement in the performance of some daily functions was seen, although pain and decreased ROM were not eliminated. Tramadol, Gabapentin and Lidocaine patches were to be continued. A repeat block was planned for treatment of CRPS of right upper extremity.

On 02/18/2020, pain severity without medication was 10/10 and with medication 7/10. Pain was described as aching, sharp, numbness, and tingling. It was felt most strongly in her R hand and R arm. The provider noted: referred pain in her left arm and fingers with some mitigation from injections and medications; cervical tenderness to palpation along mid cervical facet joints; Positive facet loading noted; decreased ROM; Lumbosacral tenderness to palpation bilaterally along lowest three segments of lumbar face joints; Positive facet loading noted; and decreased ROM of lumbar spine. Diagnosis: Complex regional pain syndrome I of right upper limb and pain in right fingers. Tramadol was refilled. An MRI of the right shoulder was ordered to assess for potential pan generator in her right shoulder. Tramadol and Gabapentin were continued and a repeat Stellate Ganglion Block planned pending insurance authorization. On 03/16/20, pain severity score average was 7/10. Pain was described as throbbing, aching, burning, stabbing, dull, sharp, pins and needles. It was strongest in her right hand and shoulder. The shoulder pain had been worsening since the accident and exacerbates when raising the arm. Dysthesias/ hyperesthesias in the second and third digits of the right hand

continued. The provider opined that Ms. Clay's pain had components of sympathetically mediated pain as well as CRPS. Ultram was continued as needed for pain. Repeat Right Stellate Ganglion Block C6 for Complex Regional Pain Syndrome of RUE was performed on 03/31/2019. On 05/31/20, pain severity rating average was 5/10. Without medication the pain was 7/10 and with it, a 3/10. Pain was described as aching, burning, throbbing, and stabbing. 80% relief from the 2nd Stellate Block was achieved, however, a degree of RUE and shoulder pain persisted. Another Stellate block was planned and Ms. Clay was to continue her Tramadol, Gabapentin and Lidocaine. The third Right Stellate Ganglion Block C6 was performed on 06/12/20 without complications.

An MRI of the right hand on 07/07/20 showed an incompletely healed fracture of the middle phalanx of the index finger and partial tear/attenuation of the adjacent flexor digitorum profundus tendon as well as a small effusion of the interphalangeal joint of the thumb with patchy marrow edema within the central lunate bone. On 07/13/20, pain severity average was 4/10. Pain was described as aching, burning, throbbing, and stabbing. Neck pain radiating to the right arm is noted. In the immediate post-block period, pain relief of 80% was obtained, but effectiveness diminishes over time. On 08/12/20, pain severity averaged 5/10. Without pain medication it rose to 10/10. With pain medication severity was at 3/10. Patient has throbbing aching, burning, stabbing, dull, sharp, pins and needles. The provider noted Ms. Clay was seeing a psychologist. Plan was to repeat Stellate block and continue Tramadol, Gabapentin, and Lidocaine. The provider also recommended the patient not return to work at this time.

### Dr. Hodari Brooks of OrthoSport and Spine Physicians

**D. Hodari Brooks, MD of OrthoSport and Spine Physicians** was consulted on 06/24/20 for a medical opinion as to whether a causal relationship exists between Ms. Clay's right shoulder pain and her work related injury. The right shoulder exam found tenderness over the AC joint without deformity which increased with any activity above the horizon. Range of motion was intact but limited extremes secondary to pain. Right hand showed obvious angulatory deformity at the PIP joint of the index and third digit. Range of motion at the PIP and DIP joints are limited. He evaluated x-rays of Ms. Clay's right shoulder and hand as well as an MRI of the shoulder without contrast. Hand x-ray showed there is possibly an element of a nonunion. No acute osseous injury was evident in right shoulder x-ray. Dr. Brooks opined that there is no question that the shoulder pain was related to the incident. He stated thrashing from the sudden movement that would be required to try to free herself could easily injure the shoulder significantly. With regard to three specific questions the physician was asked to render a medical opinion on, (s)he opined: I do think that her shoulder symptoms need treatment, I do feel they are related to the original 8/14/2019 injury, and I do recommend MRI scan. Marked fatigue, sleep difficulty, painful joints, muscle aches, and neck pain were also documented.

Ms.Clay underwent an MRI on 7/03/20 for her right shoulder, and followed up with Dr. Brooks five days later on 7/08/20. At the 7/08/20 visit, Dr. Brooks reviewed the right shoulder MRI which showed type II acromion with some impingement but no rotator cuff tearing, and a nonaggression lesion of the neck most likely reflecting a low-grade cartilaginous lesion per radiologist report. Dr. Brooks also noted an incompletely healed fracture of the middle phalanx of the index finger and a partial tear of the adjacent flexor digitorum profundus tendon, and recommended that Ms. Clay see a hand surgeon. Dr. Brooks also administered a cortisone injection of her right shoulder. My client had one more follow up visit with Dr. Brooks on 8/19/20 which showed no swelling cellulitis erythema and good range of motion, and assessed tendinitis of the right rotator cuff.

### *Dr. Shazad Wada of Pain Physicians of Atlanta*

**Dr. Shazad Wada of Pain Physicians of Atlanta** was consulted on 07/21/20 for a new patient second opinion. She stated that since benefit was gained from the three Stellate blocks, they should be continued until relief plateaus. She recommended that if functionality of the right upper extremity remained suboptimal, a 2nd surgical opinion should be obtained unless additional surgery was not a viable option. In that event, she recommended that ketamine infusion therapy should be trialed. If ketamine therapy was not fruitful, she recommended consideration of a spinal cords stimulator.

### *Dr. Alain Czaykowsky of the Czaykowsky Hand Surgery Center*

**Dr. Alain Czaykowsky of the Czaykowsky Hand Surgery** Center was consulted on 07/16/20. The doctor determined that despite physical therapy treatments, Ms. Clay "ended up with a stiff hand with limited motion involving particularly the index and long fingers and chronic pain." He noted there was extensive scarring involving the dorsal aspect of the index and right long finger and extensive volar scars, remarking that the index finger has a lateral deviation with an ulnar sided angle. The long finger has a gross evidence of malrotation, particularly on flexion and it overlaps the ring finger. Significant decreased sensory perception or anesthesia of the index finger was due to unrepaired damaged digital nerves. He felt she may require nerve grafting in the index finger due to the length of time that had lapsed since the injury occurred. Dr. Czaykowsky recommended therapy to increase ROM. Because of Ms. Clay's medical history of CRPS, the doctor felt none of the above treatments should be "carried out in a hurry" but in a stepwise fashion to improve function of her right hand. Approval of insurance for a transfer of care from Summit to this provider was sought and ultimately authorized.

On 07/27/20, Dr. Czaykowsky wrote Ms. Clay's accident and injury resulted in significant malrotation of the index finger and to a lesser extent the long finger. PIP joint stiffness of the index and DIP joint stiffness of the long and index fingers remained. He

Ms. Pamela Burdette, Sr. Claims Adjuster
March 9, 2021
Page 8

---

wrote the purpose for additional treatment was to have a functional hand. On 08/17/20, Dr. Czaykowsky noted malunion and malrotation of both digits with significant stiffness of the PIP joint of the index finger and significant stiffness of the DIP joint of the index and long fingers. He felt therapy was key in determining any additional steps to be taken. His return to work status report notes that Ms. Clay may consider one handed work.

On 10/08/20, Dr. Czaykowsky wrote that the end result of her originally work-related injury is a right hand with some functional impairment involving particularly the index and long fingers. She was found to have some degree of malrotation with radial deviation of her index finger and significant limitation of motion at the DIP joint of the index as well as the long finger. She has dense adhesions between the extensor tendon of the index with the underlying fracture site and also with the overlying scarring of the skin dorsally since it happened for the long finger. In her case with a CRPS diagnosis, he felt it best that surgical intervention be placed on the back burner, not as a first choice. The final office visit in this record was on 11/04/20. Dr. Czaykowsky noted a gain in some degree of flexion of the PIP of the index finger, but not the DIP joint. Flexion of the DIP joint of the index finger is quite limited particularly the active flexion, but passive flexion is about 25 degrees. He wrote, "Even if improvement continues for the index finger motion, she will remain with some degree of lateral deviation of the distal phalanx due to previous fracture." He felt she was not a good candidate for tenolysis and capsulotomy of the joint considering her past history of CRPS. It is in her best interest that she continue to be treated conservatively. Therapy was provided twice a week, but the doctor preferred she be seen more often. With regard to work status, the doctor wrote the patient used to work as a truck driver and she has some question about if she is able to return in such capacity. "The safe thing to do, the reasonable and rationale thing to do, for somebody who did not work for a while is to obtain a functional capacity evaluation in term of her work status," he wrote.

### *Decatur Hand & Physical Therapy Specialists*

**Decatur Hand & Physical Therapy Specialists** provided the therapy ordered by Dr. Czaykowsky. The initial evaluation on 09/14/2020 noted that Ms. Clay had an upper extremity functional index total score of 43/80 and the Degree of Impairment was rated at 47%. She was fitted with an Oval 8 Splint to help stabilize DIP in order to perform PIP and MCP ROM. The functional use of her dominant right upper extremity was noted to be affected by intrinsic tightness of all digits, decreased grip strength, pain, joint stiffness, and increased scar tissue. The plan was for therapeutic treatment at 3 times per week for 1 week then 2 times per week for 9 weeks. Her therapeutic regimen included fluidotherapy, ultrasound, functional activities manual therapy therapeutic activities therapeutic exercises, neuromuscular re-education, self-care and home management

training, orthotic management and training, patient education and home exercise instruction. PT/OT was discontinued abruptly after 13 visits because insurance authorization was exhausted. For this reason, a formal discharge visit and re-evaluation is absent. The latest therapy documentation addressing functionality of the hand reported that Ms. Clay's functional use continued to be limited by scar tissue, joint stiffness and malrotation of DIP at the index finger.

The following is an itemization of Ms. Clay's medical bills:

| Date | Provider | Amount |
| --- | --- | --- |
| 8/14/19 | Gilmer County Ambulance Services | $ 1,447.50 |
| 8/14/19 | Wellstar Kennestone Hospital | $ 7,121.10 |
| 8/14/19 | Metro Ambulance | $ 1,610.00 |
| 8/14/19-8/12/20 | Grady Memorial Hospital | $93,925.54 |
| 12/9/19-10/30/20 | Summit Spine & Joint | $25,208.90 |
| 1/23/20-10/26/20 | Dr. David B. Rush | $ 4,587.50 |
| 6/24/20-8/19/20 | OrthoSport and Spine/D. Hodari Brooks | $ 3,557.80 |
| 7/16/20-11/04/20 | Czaykowsky Hand Surgery Center | $ 1,665.00 |
| 7/21/20 | Dr. Shazad Wada/Pain Physicians of Atlanta | $    300.00 |
| 9/4/20-10/29/20 | Decatur Hand & Physical Therapy | $ 3,155.52 |

**Total:** $142,578.76

Of course, these medical bills do not reflect the pain and suffering damages sustained by my client due to the negligence of your insured.

### Lost Income

As you know, at the time of the incident my client was a driver for O'Reilly Auto Parts. Ms. Clay's job duties included "running" routes as designed by the company, such as order of stops, direction of route and roads used, running routes in a reasonable amount of time, performing pre-trip and post-trip inspections as outlined in federal regulations, completing trip sheets and driver daily logs, verifying manifest returns, delivering merchandise, being responsible for securing their load before and after each stop, and operating electric pallet jacks and lift gates to make deliveries. Ms. Clay was earning approximately $55,000 annually at the time of the incident.

As a result of the incident, however, Ms. Clay was unable to work and ultimately had to resign from the company, for which she enjoyed working. Ms. Clay resigned on

Ms. Pamela Burdette, Sr. Claims Adjuster
March 9, 2021
Page 10

---

October 2, 2020, so she lost income of more than $60,000.00. While she has attempted to obtain similar employment since then, the significant pain and limitations she still experiences has caused great difficulty in maintaining employment which requires using her hands.

### Prognosis and Quality of Life

Prior to this incident, Ms. Clay was an active, hard-working individual who regularly engaged in many social activities. The injuries she sustained, however, have caused her substantial pain, discomfort, endless aggravation, anxiety and difficulty sleeping. Additionally, given the extent and nature of her injuries, she may require further treatment and surgery. In summary, her quality of life has been severely diminished as a result of your insured's negligence. Ms. Clay is a very likeable and credible individual, who will be a compelling plaintiff should this case proceed to trial.

### Demand

Pursuant to the declaration page I received from you, your insured's applicable insurance policy limits are $1,000,000.00, including excess and/or umbrella coverage. My client has authorized me to accept your insured's policy limits of $1,000,000.00, contingent on your insured's policy limits with United Specialty Insurance Company being $1,000,000.00 and the representation that there is no other insurance applicable to this claim, United Specialty Insurance Company has a duty to tender its policy limits to limit your insured's potential exposure to the amount of the applicable liability coverage. Pursuant to Southern General Insurance Company v. Holt, 262 Ga. 267 (1992), United Specialty Insurance Company's failure to settle this case within its policy limits will render it responsible for any excess verdict due to its bad faith refusal to settle the case within policy limits. This amount is reasonable given the special damages which have been incurred and the permanent injuries which have been sustained by my client. As you know, a jury can be an unpredictable group, which may render a large verdict in a case such as this. This demand will remain open for thirty (30) days.

Please call if you have any questions. Thank you for your consideration.

Sincerely,

Jeffrey B. Grimm

cc: Ms. Dondrea Clay (w/out enclosures)